CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

JOHNNY E. JAMES JR. (SCBN 101260)
Special Assistant United States Attorney

    60 South Market Street, Suite 1200
    San Jose, California 95113
    Telephone: (408) 535-5061
    FAX: (408) 535-5081
    johnny.james@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NOS.  5:24-CR-00435 EJD |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | |
| OSCAR ANGEL ALVAREZ, | |
| Defendant. | |

## I.     Introduction

Defendant Oscar Angel Alvarez is an as-of-yet unreformed drug dealer, the product of a broken upbringing and strife that has invariably guided him to dispense deadly poisons while armed to the Santa Cruz community. Alvarez's history is a pattern of steady criminal escalation, and second chances squandered, rising to an inferentially significant role in the distribution of fentanyl and other substances on the coast. Repeated encounters with the California criminal justice system have failed to dissuade Alvarez from his criminality. Now, it is incumbent upon this federal court, acting in the interest of "justice, leavened with mercy," to impose a firm, but merciful sentence that acknowledges both Alvarez's crimes and potential for reformation. Accordingly, the United States recommends the Court impose a total sentence of no more than <u>151 months</u>.

## II. Facts & Procedural History

The presentence report contains a mostly accurate description of the background facts and the offense conduct that resulted in the indictment against Alvarez.

## III. Proposed Disposition & Argument

Alvarez's admitted offense conduct and personal background presents both severe aggravating factors and compelling mitigating factors. Aggravating Alvarez's offense is that he possessed with intent to distribute uniquely deadly controlled substances in significant quantities, did so while armed, and did so repeatedly despite multiple law enforcement interventions. Mitigating Alvarez's offense is his disadvantaged upbringing, his exposure to drugs and violence from an early age, his circumstances of deprivation at the time of his arrest, and his purported efforts to improve his condition during the pendency of this case. Weighing these factors, the United States recommends the Court impose a sentence no greater than the bottom of the guidelines, which in this case is 151 months.

### A. Legal Standard

"From the beginning of the Republic, federal judges were entrusted with wide sentencing discretion." *Conception v. United States*, 597 U.S. 481, 490 (2022) (quotation omitted). "Federal courts historically have exercised this broad discretion to consider all relevant information at an initial sentencing hearing, consistent with their responsibility to sentence the whole person before them." *Id.* at 491; *see also Dean v. United States*, 581 U.S. 62, 66 (2017) (citing *Pepper v. United States*, 562 U.S. 476, 487-89 (2011)) ("Sentencing courts have long enjoyed discretion in the sort of information they may consider when setting an appropriate sentence."). In setting an appropriate sentence consistent with statutory directives, the Court must "'impose a sentence sufficient, but not greater than necessary, to comply with' the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." *Id.* at 67 (quoting 18 U.S.C. § 3553(a)).

Procedurally, "the sentencing court must first calculate the Guidelines range, and then consider what sentence is appropriate for the individual in light of the statutory sentencing factors, . . . explaining any variance from the former with reference to the latter." *Nelson v. United States*, 555 U.S. 350, 351 (2009).

**B.     Sentences Available and Guidelines - Sections 3553(a)(3), (4), & (5)**

Following the *Nelson* order of operations, we first consider the possible sentences and the sentencing guidelines. All parties agree as to the minimum and maximum sentences which may be imposed. The United States and the United States Probation Office agree as to the applicable sentencing guidelines, but Alvarez argues against the application of certain enhancements.

**1.     Maximum Penalties**

As to Counts One (PWID Fentanyl), Two (PWID Meth), Four (PWID Fentanyl Analogue), and Five (PWID Meth), violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B) as alleged in this case carries the following potential penalties:

| **Cts. 1, 2, 4, & 5** | Minimum | Maximum | Statute |
|---|---|---|---|
| Incarceration | 5 Years | 40 Years | 21 U.S.C. § 841(b)(1)(B) |
| Supervised Release | 4 Years | Life | 21 U.S.C. § 841(b)(1)(B) |
| Fine | $0.00 | $5,000,000.00 | 21 U.S.C. § 841(b)(1)(B) |
| Special Assessment | $100.00 per Count | | 18 U.S.C. § 3013(a)(2)(A) |

As to Count Three (PWID Cocaine), a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) as alleged in this case carries the following potential penalties:

| **Ct. 3** | Minimum | Maximum | Statute |
|---|---|---|---|
| Incarceration | 0 Years | 20 Years | 21 U.S.C. § 841(b)(1)(C) |
| Supervised Release | 3 Years | Life | 21 U.S.C. § 841(b)(1)(C) |
| Fine | $0.00 | $1,000,000.00 | 21 U.S.C. § 841(b)(1)(C) |
| Special Assessment | $100.00 per Count | | 18 U.S.C. § 3013(a)(2)(A) |

There is no risk of lawful deportation as a result of this conviction as the defendant is a natural-born United States citizen.

**2.   Sentencing Guidelines**

The parties all agree that the Sentencing Guidelines offense level should be calculated under U.S.S.G. § 2D1.1.

| | |
|---|---:|
| Base offense level:  § 2D1.1(a)(5) | 32 |
| Specific offense characteristics: | |
| § 2D1.1(b)(1) – Dangerous weapon | +2 |
| Adjusted offense level: | 34 |
| Acceptance of responsibility:  § 3E1.1 | -3 |
| **Total offense level:** | **31** |

The United States and Probation agree to the total offense level of 31 and criminal history category of IV. The United States and Probation agree that the resultant guidelines range is 151-188 months.

      **(i)   Probation properly rejects Alvarez's objection to the "dangerous weapon" enhancement.**

Alvarez objects to the inclusion of a two-level enhancement for possessing a weapon. Alvarez offers four reasons for why the enhancement should not apply:

1. "Mr. Alvarez was transient and did not have a home to store the knife;"
2. "Mr. Alvarez forgot he even had the knife on him, which is why he *consented to a search by officers* and denied having a weapon on him;" (emphasis original)
3. "[H]e was not distributing any drugs at the time of his stops by law enforcement. He was looking for a place to sleep, so he had no reason for the weapon to be connected to the offense;" and
4. "[T]he knife was in his pocket, whereas the drugs were in the backpacks, so the location supports the conclusion that the knife was not connected with the offense."

Probation properly rejects this objection, and the reasons provided in support of the objection are unavailing to Alvarez. Alvarez was carrying the knife—a dangerous weapon[1]—and drugs on his person at the same time during the February 5, 2024, incident, a textbook example of the circumstances in

---

[1] "Dangerous weapon" is itself defined in U.S.S.G. § 1B1.1 cmt. 1(E). Alvarez does not contest that the knife qualifies as a "dangerous weapon" under that definition.

U.S. Sentencing Memorandum                       4
5:24-CR-00435 EJD

which the "dangerous weapon" enhancement applies.  Indeed, the Ninth Circuit has upheld the application of the enhancement in less temporally and spatially proximate circumstances.  *See, generally United States v. Lopez-Sandoval*, 146 F.3d 712, 714-15 (9th Cir. 1998) (surveying examples where the weapons enhancement was applied where weapons were found in a location wholly separate from the defendant, and in circumstances where weapons were found months later in a place in which the defendant had resided).  Furthermore, the government need not prove a connection between the weapon and the drug offense; merely that the defendant possessed the weapon during the commission of the offense.  *United States v. Stewart*, 926 F.2d 899, 900 (9th Cir. 1991) (quoting *United States v. Diego Restrepo*, 884 F.2d 1294, 1296 (9th Cir. 1989)).  The caselaw on this point is firmly settled and cannot be reasonably disputed.

The only exception to the enhancement is where, as noted by Probation, "it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. 11(A).  Even if true, Alvarez's protests that he was transient and merely forgot he possessed the knife do not support a finding that it was "clearly improbable that the weapon was connected with the offense."  There is no "transient" exception to the enhancement, nor is there a "I forgot" exception.  Additionally, Alvarez's objections are not consistent with the facts of this case.  Alvarez did not forget he possessed the knife, he simply lied about possessing it, just as he initially lied about possessing the drugs.  Furthermore, Alvarez was not alone that night and not evidently unsheltered:  Alvarez's connection Laura Godoy emerged from the motel and attempted to intervene with officers by representing herself to speak for the manager of the motel in commanding officers to leave, and then represented herself to be a cousin to Alvarez concerned for his welfare.  Alvarez and Godoy were together at the time, as now admitted by Alvarez, and it stands to reason that he had space available to him at the motel and was not outside attempting to find a place to sleep, but was outside for the purpose of peddling his toxic goods.

Under the facts of this case, the two-point "dangerous weapon" enhancement applies.

### (ii) Probation properly rejects Alvarez's objection to the inclusion of 4.5 grams of fentanyl in the calculation of the total converted drug weight.

Alvarez also objects to the inclusion in the calculation of the total converted drug weight the 4.5 grams (net) of fentanyl-cocaine mixture he possessed on February 5, 2024, arguing that mixture was for

personal use.  As Probation aptly notes, Alvarez has presented no evidence that any part of the drugs were for personal use.  To the contrary, all the substances in the bag were in quantities consistent with distribution, and were themselves proximate to materials indicative of active distribution:  baggies, a scale, and cash in varying denominations totaling $2,817.  In the specific context of fentanyl, as little as two milligrams of fentanyl can be lethal depending on a person's body size, tolerance, and past usage.  U.S. Drug Enforcement Administration, *Facts About Fentanyl*, https://www.dea.gov/resources/facts-about-fentanyl (last accessed October 1, 2025).  The simple math is that 4,500 milligrams divided by two milligrams equals 2,250 potentially fatal doses, a quantity inconsistent with personal use.

In fairness to Alvarez, the 4.5 grams of controlled substance at issue is a fentanyl-cocaine mixture and was originally tested alongside the other units of cocaine, only thereby revealed to even contain fentanyl.  While for the purposes of the sentencing guidelines it is most properly treated as 4.5 grams of fentanyl, when considered practically it should be more properly conceptualized as cocaine laced with fentanyl.  In such a context, 4.5 grams constitutes something less than 2,250 doses.  But, in such context, Alvarez's argument that the substance was for his personal use is still unavailing.  First, Alvarez claims an opioid addiction and does not report any cocaine addiction or use, and he can hardly claim for personal use that portion of the drugs that he does not use.  Second, a mixture of cocaine and fentanyl is particularly deadly, such that if he were actively using that supply as cocaine there is a good chance he would not be before the Court, but would instead be a statistic.  *See* U.S. Centers for Disease Control, *Vital Signs:  Characteristics of Drug Overdose Deaths Involving Opioids and Stimulants – 24 States and the District of Columbia, January-June 2019*, https://www.cdc.gov/mmwr/volumes/69/wr/mm6935a1.htm?s_cid=mm6935a1_w (last accessed October 1, 2025) ("In this report, one third (32.6%) of overdose deaths co-involved opioids and stimulants.  Co-use of opioids and stimulants elevates fatal overdose risk[.]").

Finally, as noted by Probation, the dispute over the 4.5 grams of cocaine-fentanyl mixture is academic.  The base offense level remains 32 whether it is included or excluded.

Under the facts of this case, the 4.5 grams of fentanyl should be included in the total converted drug weight considered by the Court.

U.S. Sentencing Memorandum                 6
5:24-CR-00435 EJD

**C.     Application of Section 3553(a) Factors**

The facts of Alvarez's offense conduct and personal history reflect both significant aggravating and mitigating factors. Consequently, the application of the factors set forth in 18 U.S.C. § 3553(a) is subject to a considerable range of interpretation and judicial discretion.

**1.     The Nature and Circumstances of the Offense - Section 3553(a)(1)**

Everything regulated under the Controlled Substances Act is restricted in one way or another for a reason, and the unlawful distribution of such substances has profound negative consequences for our society. But among them all, fentanyl stands tall as most dangerous of all, as succinctly described by the Honorable Charles R. Breyer:

> Fentanyl is deadly. While heroin generally contains only 5%-15% active drug, fentanyl is often 100% pure. It is 100 times more potent than morphine and as much as 50 times more potent than heroin. Compared to heroin, fentanyl is four times more likely to cause an overdose, and the victims of fentanyl overdoses are on average 11 years younger than the victims of heroin overdoses. A dash of fentanyl—not much larger than a few grains of sand—can be fatal.

*City and County of San Francisco v. Purdue Pharma L.P.*, 620 F.Supp.3d 936 (N.D.Cal. Aug. 10, 2022). As stated above, as little as two milligrams of fentanyl can be lethal depending on a person's body size, tolerance, and past usage. U.S. Drug Enforcement Administration, Facts About Fentanyl, https://www.dea.gov/resources/facts-about-fentanyl (last accessed October 1, 2025). The United States Sentencing Commission similarly acknowledged the unique and rising dangers presented by fentanyl trafficking when it amended the applicable sentencing guideline, § 2D1.1, in 2018:

> The Commission learned that while fentanyl has long been a drug of abuse, there are several indications that its abuse has become both more prevalent and more dangerous in recent years. For example, the Drug Enforcement Administration observed a dramatic increase in fentanyl reports between 2013 and 2015, and the Centers for Disease Control and Prevention reported that there were 9,580 deaths involving synthetic opioids (a category including fentanyl) in 2015, a 72.2 percent increase from 2014. The Commission received testimony and other information indicating that fentanyl and its analogues are often trafficked mixed with other controlled substances, including heroin and cocaine. In other instances, fentanyl is placed in pill or tablet form by drug traffickers. Although some purchasers of these substances may be aware that they contain fentanyl (or even seek them out for that reason), others may believe that they are purchasing heroin or pharmaceutically manufactured opioid pain relievers.
>
> Because of fentanyl's extreme potency, the risk of overdose death is great, particularly when the user is inexperienced or unaware of what substance he or she is using.

U.S.S.G. App. C, amendment 807 (Reason for Amendment) (2018).

Unfortunately, the number of overdose deaths resulting from fentanyl have increased dramatically from the 2015 figures on which the Sentencing Commission relied. *See* Rachel L. Rothberg & Kate Stith, *Law and the Opioid Crisis: Fentanyl: A Whole New World?*, 46 J.L. Med. & Ethics 314, 314 (2018) (20,145 fentanyl overdose deaths in 12 months ending Jan. 31, 2017). The U.S. Centers for Disease Control and Prevention reports that between 2018 and 2023, synthetic opioids like fentanyl contributed to nearly 70% of overdose deaths. U.S. Centers for Disease Control, Fentanyl Facts, https://www.cdc.gov/stop-overdose/caring/fentanyl-facts.html (last accessed October 1, 2025). The Office of the Chief Medical Examiner for the City and County of San Francisco reports that at least 635 people died of accidental drug overdoses in 2024 in that city *alone*, of which 451 (71.02%) died with fentanyl as a major contributor. Luke N. Rodda, Preliminary Accidental Drug Overdose Data Report for January 2024 through December 2024 (March 18, 2025), https://media.api.sf.gov/documents/2024_OCME_Overdose_Report.pdf (last accessed October 1, 2025).

Fentanyl-related overdose deaths weigh heavily on the public consciousness, and the scourge of fentanyl impacts all age groups, races, orientations, and social strata. In February, two Santa Rosa high school students were found dead after a they reportedly ingested what they thought was cocaine, but which was actually fentanyl-laced cocaine. Olivia Hebert, *2 Bay Area teens dead, 2 hospitalized in suspected fentanyl overdoses*, SFGATE.com, Feb. 24, 2025, https://www.sfgate.com/bayarea/article/santa-rosa-teens-fentanyl-overdose-20184697.php (last accessed October 1, 2025). In October of last year, drug user advocate and provocateur Nova Schultz overdosed on a mix of methamphetamine, anti-anxiety medications, and three types of fentanyl in their apartment in San Francisco. David Sjostedt, *Activist behind 'Downtown is for drug users' campaign dies of overdose*, The San Francisco Standard, Apr. 15, 2025, https://sfstandard.com/2025/04/15/drug-users-advocate-dead-of-overdose/ (last accessed October 1, 2025). In August last year, an 18-month-old baby died and was later found to presumptively have cocaine and fentanyl in her system; the child's mother was charged for her criminal neglect. Jessica York, *Santa Cruz police investigating baby's death as possible fentanyl overdose*, The Mercury News, Aug. 1, 2024, https://www.mercurynews.com/2024/08/01/santa-cruz-police-investigating-infant-death-possible-

fentanyl-overdose/ (last accessed October 1, 2025).

As to the number of individuals who may be involved in trafficking, while single individuals can be and most often are charged for drug distribution offenses, they are not ultimately individual crimes. Fentanyl does not propagate forth from the earth like a plant or wellspring; it is synthetically manufactured and transferred between actors engaged in the industry of its distribution and sale. Thus, whether one person is charged in relation to a particularized incident, as here, or dozens, as in a vast conspiracy, each person who engages in its distribution contributes to the greater, dreadful project. Thus, the number of persons alongside whom a defendant is charged is not reflective of the severity of their offense, but rather only reflects the scope of success of law enforcement in revealing the scope of a criminal network that was once hidden.

That Alvarez possessed with intent to distribute so much fentanyl, in tandem with methamphetamine, cocaine, heroin, and p-flourofentanyl, reflects that he commanded the trust and confidence of those who supplied him. Alvarez was no mere minnow in the sea of a larger organization, but must have been a well-regarded dealer to carry such weight and selection on multiple occasions. Alvarez was armed with a knife, and independently arranged and facilitated drug transactions evidenced by texts recovered from his cell phone. Perhaps most alarmingly, Alvarez possessed with intent to distribute alongside the rest of the cocaine at least one item of cocaine-fentanyl mixture, a distinctly deadly substance. Although Alvarez is by no means a kingpin or managerial participant of a conspiracy, for whom the most severe sentences are reserved, he is not the minimally involved user-dealer, courier, or incidental participant for whom the minimal sentences are appropriate.

Altogether, the application of this factor serves to support a severe, but not the most severe penalty which the Court may impose.

### 2. The History and Characteristics of the Defendant - Section 3553(a)(1)

Alvarez's history and characteristics break more evenly between his disfavor and favor. Alvarez's criminal history weighs very heavily against him, as the prior convictions are not mere infractions, but include significant crimes: burglary, weapons offenses, controlled substance possession, and giving false information to officers. While Alvarez was only found with knives in this case, Alvarez was previously convicted for carrying a Kimber Eclipse Ultra II alongside small quantities of meth and

marijuana when he was already a felon. Alvarez's pattern of criminality shows a troubling escalation over time, and the present offenses reflect the most severe violations yet. The present offense conduct is not aberrational.

In mitigation, Alvarez himself is the product of an upbringing that led him to where he is today. Alvarez grew up in a home surrounded by drug abuse, addiction, and domestic abuse. Alvarez has never known his biological father, and his family fell into hardship and homelessness upon the separation and departure of his stepfather. It is thus not difficult to see why Alvarez has turned to a life of criminality.

From what the United States can discern from the recordings of each encounter with law enforcement, Alvarez is himself an engaging and seemingly friendly individual. Alvarez's interactions with police were not hostile, only dishonest, and he promptly abandoned any defense of his falsehoods upon first contact with the truth. For example, during the February incident, he lied about having any drugs or weapons, but immediately acknowledged the knife on his person once law enforcement detected the object in his pocket, consented to a search of his bags, and acknowledged meth and more would be found in his bags. During the May incident, as police searched his vehicle, Alvarez broke silence while sitting on the curb and disclosed to law enforcement that there were drugs in the center console. Alvarez's occasional submissions to the truth merit acknowledgement in sentencing.

Altogether, the application of this factor serves to support a severe, but not the most severe penalty which the Court may impose.

### 3. Punishment, Deterrence, Incapacitation, Rehabilitation - Section 3553(a)(2)

The United States has already expounded upon the severe harms caused by the trafficking of controlled substances, in particular fentanyl, and will not restate them again here. Suffice to say, the punishment and deterrence of fentanyl distribution is of paramount importance, particularly here in the Northern District of California where the ravages of overdose deaths have been so severe. In determining what punishment is necessary in any given drug trafficking case, it is incumbent upon the Court to impose a sentence which serves the appropriate criminological and Congressionally intended end of increasing the "cost" of drug trafficking such that the expected value of engaging in the trade is not worthwhile to prospective participants. *See, generally* Edward J. Tafe, *Sentencing Drug Offenders in Federal Courts: Disparity and Disharmony*, 28 USFLR 369 (1994) (exploring the various

interpretations by circuit courts of the "market-oriented" design of the Anti-Drug Abuse Act of 1986). Here, with drug weights well in excess of the § 841(b)(1)(B) threshold across multiple substances, a strong penalty is well advised.

As for incapacitation and rehabilitation, Alvarez's personal history and characteristics point to both a need for significant incapacitation and a real possibility of meaningful rehabilitation. Alvarez is unlikely to cease in his escalating criminal activity absent a severe disruption, and the Court is well positioned to so disrupt it and thereby protect the people of Santa Cruz for years to come. However, during an extended custodial sentence, Alvarez may hopefully benefit from opportunities within the Federal Bureau of Prisons to advance his education (he has a high school diploma) and skills to better support himself once he is released. Alvarez's potential for rehabilitation is addressed not only by a significant custodial sentence, but by the guidance and resources which may be made available through an extended term of supervised release.

### 4. Comparative Data – Section 3553(a)(6)

The presentence report provides comparative data from the Judiciary Sentencing Information (JSIN) platform. The data, which reflects an average sentence of 128 months and a median sentence of 135 months among similarly situated defendants, reflects that a significant number of such defendants are sentenced subject to downward variances from the guidelines. As such, the United States would discourage the Court from imposing a sentence greater than the bottom of the guidelines range. Indeed, the JSIN data reflects the Court enjoys a wide range of discretion in how severe a penalty may be imposed, include those which may necessitate a variance from the guidelines.

The United States recommends that Alvarez receive a sentence more severe than the average and median sentences imposed for similarly situated defendants, but the comparative data discourages a recommendation of a maximally severe sentence.

### 5. Restitution - Section 3553(a)(7)

There is no restitution at issue in this case.

### IV. Recommendation and Conclusion

For all of the reasons forgoing, the United States recommends the Court sentence Alvarez to imprisonment in the custody of the Federal Bureau of Prisons for concurrent terms of no more than 151

<u>months</u> for each Count of the indictment.  The United States does not recommend the imposition of any fine, in light of Alvarez's impecunious financial condition and the counterproductive impact such a fine would have on Alvarez's ability to productively reenter society upon the completion of his custodial term.  The United States recommends the Court further sentence Alvarez to a <u>five-year</u> term of supervised release.  Finally, the United States recommends the Court impose a total special assessment of $500.00:  $100.00 for each of the counts to which Alvarez pled guilty.  For the same reason as the fine, any additional assessments which may be provided for by law should be waived.

    It is the recommendation of the United States that such a sentence is sufficient, but not greater than necessary, to address the requirements of 18 U.S.C. § 3553.

DATED:  October 1, 2025                              Respectfully submitted,

                                                CRAIG H. MISSAKIAN
                                                United States Attorney

                                                */s/ Johnny E. James Jr.*
                                                JOHNNY E. JAMES JR.
                                                Special Assistant United States Attorney